**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FREDERICK P. FRY and** | : | **CIVIL ACTION** |
| **ELEANOR H. FRY,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **NO. 12-4914** |
| | : | |
| | : | |
| **THE PHOENIX INSURANCE CO.,** | : | |
| **Defendant** | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                          **September  19, 2014**

Plaintiffs, Frederick P. Fry and Eleanor H. Fry (collectively "the Frys"), brought this action alleging breach of a home owners' insurance policy issued by Defendant The Phoenix Insurance Company ("Phoenix"), as well as a claim for bad faith, arising from Phoenix's denial of two claims the Frys made under their policy.  In 2011, the Frys made a claim for water damage that allegedly caused an exterior stone veneer wall to bulge.  In 2012, they made a claim when the same wall collapsed.  Phoenix denied both claims. Presently pending is Phoenix's Motion seeking summary judgment on both the breach of contract claim and the bad faith claim, based upon a Statement of Undisputed Facts ("DSUF").  For the reasons that follow, the Motion is granted and judgment is entered in favor of Phoenix.

**I.      THE SUMMARY JUDGMENT RECORD**

The Frys have owned and lived in a house located at 115 E. Main Street, Fleetwood, Pennsylvania ("the Property") for over forty years.  (Pl.'s App. at 245 (Dep.

of Frederick Fry ("Fry Dep.") at 10:16-18).)   The wood-frame house is two stories, covered in a stone veneer, and supported by a rubble stone foundation.  (Def.'s Ex. I (Barry Isett & Associates Report) (hereinafter "Isett Report") at 2.)  At all relevant times, the Property was covered by Phoenix Policy No. 948258604-633-1.  (Def.'s Ex. C (2010-2011 Homeowner's Insurance Policy Statement) (hereinafter "2010 Policy"); Def.'s Ex. D (2011-2012 Homeowner's Insurance Policy Statement) (hereinafter "2011 Policy").)

In "Section 1 — Perils Insured Against," the Policy states that it "insure[s] against risk of direct physical loss to property described in Coverages A and B." (2010 Policy at 7; 2011 Policy at 7.)  In Coverage A, the Policy lists a number of specific exclusions to coverage, including an exclusion "for loss caused by . . . wear and tear, marring, deterioration."  (2010 Policy at 7-8; 2011 Policy at 7-8.)  The Policy also lists a number of additional coverages, including coverage in the event of a building collapse.  (2010 Policy at 4; 2011 Policy at 4.)  In that section, the Policy provides that it "insure[s] for direct physical loss to covered property involving collapse."  (2010 Policy at 5-6; 2011 Policy at 5-6.)  A collapse is defined as "an abrupt falling down or caving in of a building . . . with the result that the building or part of the building cannot be occupied for its current intended purpose."  (2010 Policy at 6; 2011 Policy at 6.)  The Policy continues that coverage will apply for a collapse if it was caused by "[d]ecay that is hidden from view unless the presence of such decay is known to the insured prior to collapse or there are visible signs of water damage and the insured has not taken prompt action to prevent further damage."  (2010 Policy at 6; 2011 Policy at 6.)

In 2003, the Frys noticed that the stone veneer on the west elevation of the Property was bulging.   (App. at 260 (Fry Dep. 25:19-20).)   At their request, an engineering report assessing the bulging wall was prepared on October 3, 2003 by Barry Isett & Associates Inc.  (Isett Report 1.)   This report, written by Isett's Manager of Construction Services, Richard K. Fain, and Engineer-in-Training, Timothy J. Campion, was based on a visual inspection of the exterior and interior of the residence and the engineering expertise of the inspectors.  (Id. at 3.)  The inspectors observed a bulge in the stone veneer between the windows of the first floor.  (Id. at 1.)  They also observed that numerous repairs had been made to the wall.  Id.  The report concluded that the bulging "was caused by an insufficient number of veneer wall ties and fasteners."  (Id. at 2.)  The report "recommend[ed] that this situation be addressed in the very near future so as to avoid the possibility of complete failure of the veneer and the stone falling down."  (Id.[1])  The inspection "did not include any demolition or testing of materials and building components."  Id.

The Frys paid Ken Saul, a general contractor, $22,000 to repair the bulging wall.  (App. at 262 (Fry Dep. 27:13-15, 18-24).)  In order to repair the wall, Saul removed the

---

[1] The Frys deny receiving a copy of the 2003 engineering report.  They also assert that they do not recollect receiving a copy of the 2003 engineering report before the commencement of the instant litigation.  (Pl.s' Resp. to Def. Statement of Undisputed Facts ¶ 10.)  A party asserting that a fact is genuinely disputed must support its assertion by (1) citing to particular parts of the record, (2) showing that the materials cited to do not establish the absence or presence of a dispute, or (3) showing that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1).  The Frys' denial of ever receiving a copy of the Isett Report does not cite to any evidence to support the assertion made, nor does it make any showing required by the rule. Accordingly, I consider the fact that the Frys had knowledge of the Report's findings as undisputed for purposes of the Motion, pursuant to Federal Rule of Civil Procedure 56(e)(2).

stones from the area of the bulge and reset the stones in the wall.  (App. at 262 (Fry Dep. 27:22-24).)  Following the work, the bulge was "completely flat."  (App. at 263 (Fry Dep. 28:9).)  A claim for the 2003 loss was denied by Phoenix.  (DSUF ¶ 16.)  Denial of the 2003 claim is not at issue in this litigation.

On July 25, 2011, the Frys filed a claim for a loss that occurred to the interior and exterior of the Property following a storm ("the 2011 loss").  (App. at 26.)  After filing the claim for the 2011 loss, the Frys commissioned an engineering report.  (Def.'s Ex. F (the "Gold Report").)  Professional Engineer Scott D. Gold of Lock Ridge Engineering, LLC prepared this report, which was completed on August 20, 2011.  (Gold Report at 1.)  Gold is a Professional Engineer licensed in several states, including Pennsylvania, with a Master's of Science degree in Civil Engineering from Pennsylvania State University, and a Bachelor's of Science degree in Civil Engineering from Lafayette College.  (App. at 114 (Dep. of Scott D. Gold ("Gold Dep.") 6:9-24, 7:1-20).)  To prepare his report, Gold conducted a visual inspection from the outside and the inside of the premises.  (App. at 137 (Gold Dep. 30:3-8).)  He was unable to evaluate the condition of the mortar between the stones based on his visual inspection.  (Id. at 30:3-13.)

In the course of his investigation, Gold observed "visible movement" to the wall "from both inside and outside."  (App. at 31 (Gold Report at 1).)  His measurements indicated that "the interior frame walls were relatively plumb, which confirmed the movement is in the stone veneer."  (Id.)  The report notes that "the windows appear to have moved with the stone, while the framed wall has not moved," indicating that "there is not a good connection between the stone veneer and the framed wall."  (Id.)  The report

4

continues, "Ken [Saul] reported, as indicated in the photographs taken, they discovered during repairs eight years ago very few masonry anchors securing the stone to the framing behind." (Id.)  Based on his findings, Gold concluded that "while the stone does not appear to be in danger of sudden collapse at this time, repairs are needed." (App. at 31-32 (Gold Report at 1-2).)  He concluded that "if repairs are not going to be made within the next couple months I recommend temporary bracing from the outside as soon as possible." (App. at 32 (Gold Report at 2).)  Gold also opined that he was "uncertain as to whether the movement has been gradual or occurred during a specific event such as a wind storm.  It is possible the observed movement occurred at a specific event." (Id.)

In correspondence with the Frys dated September 29, 2011, Phoenix agreed to pay for repairs to the interior of the home, but denied coverage for the repairs to the exterior wall. (App. at 26.)  Phoenix based the partial denial on the assertion that the damage was "not sudden and accidental and was not a result of the storm which occurred on the loss date in question.  As such, there is no coverage for this portion of the loss." (Id.[2])

Phoenix based its partial denial on its own engineering report conducted by Russel E. Daniels of Paul Zamrowski Associates, Inc.  (Id.)  Daniels is a licensed Professional Engineer with a Bachelor of Science degree in Civil Engineering from Drexel University. (App. at 195-96 (Dep. of Russel E. Daniels ("Daniels Dep.") 6:23, 7:23-25).)  To prepare his report, Daniels conducted a visual inspection of the bulging wall from both the

---

[2] The Frys agree that their insurance claim was denied by the Defendant, but assert that the reason behind the denial is "not entirely known." (Pl.s' Resp. to Def. Statement of Undisputed Facts ¶ 16.)  Again, they fail to present any evidence to dispute the stated cause for the denial in a manner consistent with Rule 56(c)(1).  Accordingly, I consider Phoenix's stated basis for the denial as undisputed.

interior and exterior of the Property.  (App. at 199-200 (Daniels Dep. 10:24-25).)  Daniels did not, however, remove the exterior, cosmetic mortar from the outside of the bulging wall to inspect the structural mortar behind it.  (App. at 206 (Daniels Dep. 17:10-13).) During his visit to the Property, the Frys informed Daniels about the previous repairs made by Ken Saul and that he had told them that there were few or no anchors in the wall.  (App. at 202 (Daniels Dep. 13:5-9).)  In his report, Daniels noted he observed "large gaps" inside the second floor and the attic window.  (App. at 29.)   He observed further that the stone veneer had "bulged outward and the windows moved with the stone veneer" and that the "stone veneer was visibly bulged when viewed from the outside." (App. at 29.)   The report also states that "the contractor that did the repairs in 2003 reportedly stated the stone veneer had very few masonry anchors."  (Id.)

Daniels concluded that the "bulging of the stone veneer was caused by inadequate anchorage to the wood framing.  Deterioration of the anchors most likely allowed the stone veneer to bulge."  (App. at 29.)  He further opined that "bulging of masonry and stone walls typically occurs over years, not days" and that, had the bulge occurred suddenly, "there should be large cracks which weren't in the bulged area."  (App. at 30.) He also noted that "the stone veneer would have to be removed to determine the condition, type, and number of anchors."  (App. at 29.)   Finally, he recommended that the "stone veneer should be temporarily braced until repairs can be made."  (App. at 30.)

The Frys reported to Phoenix on or about February 24, 2012, that the bulging wall had collapsed.  (DSUF ¶ 17.)  Between the July 2011 loss and the collapse of the exterior wall in February 2012, no repairs were made to the bulging wall, nor was any bracing

installed to prevent the wall from collapsing. (DSUF ¶ 18.) The Frys did, however, contact Derrick Leininger, owner of Tri-Valley Stone & Stucco Solutions, LLC, to repair the wall. (App. at 48 (Dep. of Derrick Leininger ("Leininger Dep.") 6:8-12).) Leininger has owned his business since 2000. (App. at 48-50 (Leininger Dep. 6:13-14; 8:6-10).) He testified that he provided an estimate to the Frys in either August or September, 2011, to remove the bulging stone, haul it away, and stucco that portion of the wall. (App. at 57-58 (Leininger Dep. 14:17-24, 15:1).) However, he could did not produce a copy of the estimate at his deposition. (App. at 57 (Leininger Dep.14:20-21).) According to Leininger, the Frys hired him to repair the bulging wall, but no deposit was ever given to Leininger, and no work was completed on the Property before the 2012 collapse. (App. at 58 (Leininger Dep. 15:9-20).)

Leininger, at the request of the Frys' counsel, wrote an undated letter outlining his opinion on the cause of the collapsed wall. (App. at 42.) Leininger stated that, "after removing [the bulging section] it was clearly indicated that the mortar used to set or lay the stones in place was disintegrated, and that only the grouting on the face of the stones was holding the stones from completely falling down." (Id.) He opined that "the cause for the collapsing stone is strictly due to the disintegrated mortar between the stones which I believe was from poor mixing of sand and mortar when the stone was originally layed [sic]." (Id.) Leininger testified that this conclusion was based on the fact that he "was there every day for tearing that stone down." (App. at 94 (Leininger Dep. 51:22-24).) He asserted that he had "personally seen . . . that the mortar used to set the stone,

completely deteriorated.  There was nothing holding the stone together, other than the mortar on the face of the stone."  (App. at 95-96 (Leininger Dep. 51:24, 52:1-4).)

After the 2012 collapse, Phoenix again retained Engineer Daniels "to determine the cause of the damage to the right side stone wall."  (Def.'s Ex. G (Engineering Report of March 12, 2012) (herein after "2012 Daniels Report).)  To prepare his report, Daniels did not enter the house, but inspected the collapsed section of the wall from the outside. (App. at 218 (Daniels Dep. 29:18-19).)  He examined the hole in the stone veneer, the wall behind that veneer, and the fallen stone and mortar debris on the ground below. (App. at 218 (Daniels Dep. 29:20-23).)  He found that the mortar holding the wall together was "very weak and deteriorated," that he "could easily crumble the mortar between [his] fingers," and that the "mortar wasn't bonded to the stones."  (2012 Daniels Report at 2.)  He found that the collapsed wall "doesn't have as much sun exposure as the other sides of the home," which "allows more moisture to remain in the stone veneer and have more cycles of free/thaw action."  (Id.)  He opined that the "lack of anchorage of the stone wall to the wood framing, and the weak/deteriorated mortar caused the wall to bulge, crack, and partially collapse," and that the repeated water infiltration and freeze/thaw action deteriorated the mortar.  (Id.)  He concluded that, in his "professional opinion with a reasonable degree of engineering certainty" the stone wall "bulged, cracked, and partially collapsed because the stone wall was not anchored to the wood framing, and because the mortar was weak/deteriorated."  (Id. at 3.)  He also stated that the remaining portion of the wall would require replacement and that the rest of the wall "is in imminent danger of falling."  (Id.)

After receiving the 2012 Daniels' report, Phoenix denied the Frys' claim. (Def.'s Ex. H (April 17, 2012 Denial Letter).)   The denial letter states that Phoenix's investigation "revealed that the collapse of the stone veneer wall was due to lack of anchorage to the wood framing and wear, tear and deterioration of the mortar holding the stone veneer together." (Id.)  The letter goes on to list a number of provisions on which Phoenix based its coverage determination. (Id.)  The letter concludes by (1) referring the Frys to a policy condition wherein Phoenix "expressly reserves" its rights and defenses, (2) expressly states that the letter is not an "exhaustive listing of policy term[s]," and (3) preserves its right to supplement its denial of coverage "should the facts and/or circumstances presented to us indicate the applicability of additional terms." (Id. at 1-3.)

## III.   STANDARD OF REIVEW

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be

met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. A party asserting that a fact is genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials. Fed. R. Civ. P. 56(c)(1)(A). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252. If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992).

## IV. ANALYSIS

When exercising diversity jurisdiction, a federal court sitting in Pennsylvania must predict how the Supreme Court of Pennsylvania would decide questions of state law. Special Surfaces Int'l, Inc. v. Cont'l Cas. Co., 609 F.3d 223, 237 (3d Cir. 2010) (citing

Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78-80 (1938)).  The Court is obligated to follow the relevant decisions from the Supreme Court of Pennsylvania, and give "due regard" to the decisions of the Commonwealth's intermediate appellate courts.  Special Surfaces, 609 F.3d at 237 (quoting Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir. 2000)).

In the context of an insurance dispute in Pennsylvania, "the insured bears the initial burden of proving facts that bring its claim within the policy's affirmative grant of coverage."  Sciolla v. W. Bend Mut. Ins. Co., 987 F. Supp. 2d 594, 599 (E.D. Pa. 2013) (quoting Koppers Co., Inc. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1446 (3d Cir. 1996)).  If the insured meets its burden of proving coverage and the insurer raises a defense based on policy exclusion, the burden of establishing the applicability of that exclusion falls to the insurer.  Id. (citing Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999)).  Exclusions must be construed narrowly against the insurer.  Estate of O'Connell ex rel. O'Connell v. Progressive Ins. Co., 79 A.3d 1134, 1140 (Pa. Super. Ct. 2013) (citing Miller v. Boston Ins. Co., 218 A.2d 275, 277 (Pa. 1966) and First Pa. Bank, N.A. v. Nat'l Union Fire Ins. Co., 580 A.2d 799, 802 (Pa. Super. Ct. 1990)).

Generally, where the terms of an insurance contract are clear and unambiguous, a court is obligated to enforce the plain language of the agreement.  Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900-901 (3d Cir. 1997) (citing Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303, 1309 (3d Cir. 1994)).  However, where a contract provision is ambiguous in the context of the entire agreement, the questionable provision must be construed in favor of the insured.  Devcon Int'l Corp. v. Reliance Ins. Co., 609 F.3d 214,

218 (3d Cir. 2010) (citing <u>J.C. Penney Life Ins. Co. v. Pilosi</u>, 393 F.3d 356, 364 (3d Cir. 2004)).  The determination of a provision's ambiguity is "generally performed by a court rather than by a jury."  <u>401 Fourth Street, Inc. v. Investors Ins. Gp.</u>, 879 A.2d 166, 171 (Pa. 2005) (quoting <u>Madison Constr. Co.</u>, 735 A.2d at 106 (Pa. 1999)).  Moreover, this interpretative question is one of law that is properly resolved on a motion for summary judgment.  <u>Harleysville Ins. Co. v. Aetna Cas.&  Sur. Ins. Co.</u>, 795 A.2d 383, 385 (Pa. 2002) (citing <u>Harstead v. Diamond State Ins. Co.</u>, 723 A.2d 179, 180 (Pa. 1999)).

A disagreement between the parties on the meaning of a provision of the policy does not necessarily render the provision ambiguous.  <u>12th Street Gym, Inc. v. Gen. Star Indem. Co.</u>, 93 F.3d 1158, 1165 (3d Cir. 1996) (citing <u>Vogel v. Berkley</u>, 511 A.2d 878, 887 (Pa. Super. Ct. 1986)).  Policy language "is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." <u>Travelers Prop. Cas. Co. of Am. v. Chubb Custom Ins. Co.</u>, 864 F. Supp. 2d 301, 312 (E.D. Pa. 2012) (quoting <u>Madison Constr. Co.</u>, 735 A.2d at 106).   In the case of ambiguity, a court must be careful to avoid rewriting the policy language in a way that conflicts with the plain meaning of the policy's language, even though the provision in question must be interpreted in favor of the insured.  <u>Bhd. Mut. Ins. Co. v. Salem Baptist Church of Jenkintown</u>, 985 F. Supp. 2d 624, 632 (E.D. Pa. 2013) (citing <u>Lucker Mfg. v. Home Ins. Co.</u>, 23 F.3d 808, 814 (3d Cir. 1994)).

Courts in Pennsylvania, noting the adhesive nature of insurance contracts, have found that some "normal contract principles" do not apply.  <u>Pressley v. Travelers Prop. Cas. Corp.</u>, 817 A.2d 1131, 1139 (Pa. Super. Ct. 2003) (quoting <u>Collister v. Nationwide</u>

Life Ins. Co., 388 A.2d 1346, 1351 (Pa. 1978)). For example, when a Pennsylvania court considers an insurance contract, it does not only evaluate it for ambiguity, but also considers "the reasonable expectation of the insured." Betz v. Erie Ins. Exchange, 957 A.2d 1244, 1253 (Pa. Super. Ct. 2008) (quoting Bubis v. Prudential Prop. & Cas. Ins. Co., 718 A.2d 1270,1272 (Pa. Super. Ct. 1998)). Such an evaluation is not limited to situations where the contract is ambiguous. Betz, 957 A.2d at 1253 (citing Pressley, 817 A.2d at 1140 (Pa. Super. Ct. 2003)).

### A. The Breach of Contract Claim

Phoenix argues it is entitled to summary judgment on the Frys' breach of contract claim on several grounds. First, it argues that, based on the findings of several engineers who inspected the Property, the bulging that forms the basis of the 2011 loss and the 2012 collapse were caused by a deterioration of the mortar and anchors connecting the stone veneer wall to the wood frame of the house. This, according to Phoenix, triggered the Policy's exclusion for wear and tear, marring, and deterioration. (Def.'s Br. at 9-10.) Second, it argues that coverage for the 2012 collapse is barred by the language of Policy, since the summary judgment record shows that the Frys were aware of the problem with the wall and failed to correct it before the collapse occurred. Alternatively, Phoenix asserts in its Reply Brief that the bulge and the collapse were not fortuitous events, and were therefore both excluded from coverage under the Policy because neither the 2011 loss nor the 2012 collapse were "sudden or unexpected" events. (Def.'s Reply Br. at 3-4.)

### 1.   Application of the wear and tear exclusion.

Phoenix argues that "[b]ecause of the deteriorated condition of the wall, Phoenix denied Plaintiffs' claims for repairs to the exterior wall in 2003, 2011 and 2012 based on the terms of Plaintiffs' policy providing that loss due to 'wear and tear, marring, deterioration' is not covered." (Def. Br. at 9.)  It argues that the summary judgment record shows that the 2011 loss most likely occurred slowly over the years since the 2003 repairs. (Id. at 9-10.)  It asserts that it "denied coverage of the 2012 claim on the basis of wear, tear and deterioration because [its] 'investigation revealed that the collapse of the stone veneer wall was due to lack of anchorage to the wood framing and wear, tear and deterioration of the mortar holding the stone veneer together.'" (Id. at 10 (quoting Def. Ex. H).)

The Frys respond that these denials of coverage based on the wear and tear exclusion were improper since it was later discovered that there were **no** anchors holding the stone veneer to the wooden frame at all.  They argue that there is a genuine issue of fact whether the bulge and collapse were caused by deteriorated mortar or by the complete lack of anchors.  The Frys point to the 2012 Daniels report, which opined that the 2012 collapse occurred from one or both of the two possible causes:  "because the stone wall was not anchored to the wood framing and because the mortar was weak/deteriorating." (2012 Daniels Report 3.)  The Leininger Letter, written after the collapse of the wall, also states that "there were no wall ties or anchors in place for tying the stone to the framing of the house other than the small section of stone that was replaced in 2003." (Leininger Letter 1.)  The Frys argue that these reports not only

provide direct evidence of the cause of the 2012 collapse, but are also relevant to the 2011 loss since, after examining the rubble from the collapse, both observers noted that there were no wall-anchors at all.  (2012 Daniels Report 3; Leininger Letter 1.)  In light of this discovery after the collapse, the Frys argue that it would have been impossible for **deteriorating** anchors to have caused the 2011 loss or the 2012 collapse since the anchors did not exist at all.  Thus, they conclude, the wear and tear exclusion cannot apply to the two losses.

While Phoenix responds that the Frys have failed to come forward with evidence to demonstrate how the discovery of the complete lack of anchors in 2012 impacts its 2011 denial of coverage (see Def. Reply at 4-5), this argument is immaterial to the coverage issue.  In Pennsylvania, the burden of proving the application of a policy exclusion falls to the insurer.  See Madison Const. Co., 735 A.2d at 106.  Accordingly, the burden is on Phoenix to show that the claimed exclusion applies, and it makes no cogent argument why information learned after its initial coverage decision had been made should not be considered.  The Frys have come forward with evidence that there were no masonry anchors holding the stone veneer to the framing of the house, and that this fact was not learned until after the collapse.  Since they have come forward with evidence to show that the 2011 loss could have been caused by the absence of anchors — of which they had no knowledge until after the collapse — rather than the deterioration of the mortar, a reasonable jury could conclude that the wear and tear exclusion does not apply to the 2011 claim.  Accordingly, summary judgment must be denied on this ground.  This is, however, a pyrrhic victory for the Frys.

**2.      Application of the collapse clause.**

Phoenix next asserts that the Frys' knowledge of the problem with the wall, coupled with their failure to promptly remedy the structural deficiency, prevents coverage for the 2012 collapse.  (Def. Mem. at 12.)  It points out that the policy only covers a collapse if it was caused by "[d]ecay that is hidden from view unless the presence of such decay is known to the insured prior to collapse or there are visible signs of water damage and the insured has not taken prompt action to prevent further damage."  (2010 Policy 6; 2011 Policy 6.)  Because the Frys knew that the mortar was decayed and the wall lacked sufficient masonry anchors years before the collapse occurred, and they did not take prompt action to prevent the collapse, Phoenix asserts that there is no coverage under the Policy.  The Frys respond that the collapse clause requires that they must have known the specific type of decay that caused the collapse.  (Pl. Mem. at 12.)  They argue that Phoenix has not met its summary judgment burden to show that they were aware of the cause of the collapse, since the absence of **any** masonry anchors was not discovered until after the collapse had occurred.

I conclude that the summary judgment record shows there is no genuine issue of material fact regarding the 2012 collapse that the Frys knew of the problem with the mortar and the lack of masonry anchors prior to the collapse; I also conclude that the fact that they did not learn until after the collapse there were no anchors at all is immaterial to the coverage issue.  In 2003, the Isett Report noted that "some of the mortar joints have deteriorated as evidenced by loose and/or missing mortar."  (Isett Report at 1.)  This same report also concluded that the 2003 bulge was caused "by an insufficient number of

veneer wall ties." (Isett Report at 2.) The 2011 Daniels Report reached the same conclusion, stating that the "the bulging of the stone veneer was caused by inadequate anchorage to the wood framing." (2011 Daniels Report at 2.) Indeed, the Frys themselves had informed Daniels about the previous repairs made by Ken Saul and that there were few or no anchors in the wall. His Report also notes that the mortar holding the stones in the wall together may have deteriorated due to water damage. (2011 Daniels Report at 2.) Additionally, the Gold Report, relying on knowledge from the Frys' contractor Ken Saul, noted the presence of "very few masonry anchors securing the stone to the framing behind it." In light of all the evidence, there is no triable issue whether the Frys were unaware of the structural deficiencies with their wall.

I also conclude that the summary judgment record shows there is no genuine issue of material fact that the Frys failed to take prompt action to prevent the collapse. While they assert that they acted reasonably subsequent to discovering the bulge in 2011 by hiring Leininger to make repairs, in his deposition Leininger stated that he only offered the Frys an estimate to complete work sometime in the late summer or early fall of 2011, and that the Frys paid no deposit for the work. (Leininger Dep. 15:9-11, App. at 42.) It is undisputed that no repair was actually undertaken before the wall collapsed on February 24, 2012. More significantly, the record is undisputed that the Frys never braced the wall until the repair could be undertaken, even though they were told that a collapse would occur if the wall was not braced until it was repaired. (See Gold Report at 1-2; 2011 Daniels Report at App. 30).

Because no rational fact finder could determine that the Frys' delay in having the wall repaired and their failure to brace the wall pending the repair was objectively reasonable, the Frys have failed to meet their burden to raise a factual question sufficient to withstand summary judgment on the application of the collapse clause.

### 3.    Fortuity

Phoenix also argues that both its denials of coverage were proper because neither 2011 loss nor the 2012 collapse were "sudden or accidental," and therefore neither was a "fortuitous event." (Def.'s Reply Br. at 3-4.)  It argues that, because the Frys were aware of structural problems with the wall, even if they did not know the exact reason for the problems, the bulge and the eventual collapse were not fortuitous events.  The Frys respond that the fact that the loss may not have been "sudden and accidental" is irrelevant to determining the applicability of any policy exclusion because no such language of exclusion exists in the Policy.  (Pl. Br. at 7.)  They argue that the only exclusions to coverage are those contained within the four corners of the Policy, and the Policy's lack of any explicit "fortuity" exclusion prohibits Phoenix from raising it as defense to coverage.  Id.  Moreover, they assert that a bulging and collapsed stonewall, which stood for more than fifty years, is "exactly the sort of unforeseeable risk covered by the all-risk policy." (Id. at 13.)  I conclude that, under Pennsylvania law, a lack-of-fortuity exclusion is implied in every all-risk policy, such as the Policy at issue here.  I further conclude that Phoenix has met its summary judgment burden to show that neither the 2011 bulge nor the 2012 collapse was fortuitous as a matter of law.

Under Pennsylvania law as predicted by the United States Court of Appeals for the Third Circuit, there is an implied exclusion in every all-risk insurance policy for losses that are not fortuitous.  See PECO Energy Co. v. Boden, 64 F.3d 852, 858 (3d Cir. 1995) (citing Intermetal Mexicana, S.A. v. Ins. Co. of N. Am., 866 F.2d 71, 75-76 (3d Cir. 1989) (predicting that the Supreme Court of Pennsylvania would recognize a "judicially created 'fortuity' exclusion from coverage" based on the generally accepted principle that "every 'all risk' contract of insurance contains an unnamed exclusion — the loss must be fortuitous in nature")); Koppers Co., Inc. v. Aetna Cas. And Sur. Co., 98 F.3d 1440, 1447 (3d Cir. 1996) (predicting that, "[a]s with exclusions stated in an insurance policy itself, when an insurer relies on public policy to deny coverage of a claim, the insurer must bear the burden . . . .  [W]e predict that the Pennsylvania Supreme Court would place on the insurer the burden of proving that the circumstances of the loss were such that coverage would be inconsistent with that public policy").  The fortuity requirement is based on "[p]ublic policy considerations and the general nature of insurance," preventing an insurance policy "from providing coverage for a policyholder's losses unless those losses are fortuitous.  Law and Practice of Insurance Coverage Litig., § 35:3 (citing Certain Underwriters at Lloyds, London v. Oryx Energy Co., 957 F. Supp. 930, 936-37 (S.D. Tex. 1997), judgment rev'd on other grounds, 142 F.3d 255 (5th Cir. 1998).  This "foundational requirement for coverage exists independent of the language in any given policy; it inheres in virtually every insurance policy."  Id. (citing Smith v. Hughes Aircraft Co. Corp., 783 F. Supp. 1222, 1234 (D. Ariz. 1991), aff'd in part and rev'd in part on other grounds, 22 F.3d 1432 (9th Cir. 1993) (applying California law) ("Clearly,

the parties intended, and public policy requires, some element of fortuity in their indemnification contracts."); General Housewares Corp. v. National Sur. Corp., 741 N.E. 2d 408 (Ind. Ct. App. 2000); Centennial Ins. Co. v. Bailey, No. 05-98-0007, 2000 WL 1515158, at *10 (Tex. App. (Dallas) Oct. 12, 2000); Aluminum Co. of America v. Aetna Cas. & Sur. Co., 998 P.2d 856, 878 (Wa. 2000) (applying Pennsylvania law).

"A fortuitous event . . . is an event which so far as the parties to the contract are aware, is dependent on chance." PECO Energy Co., 64 F.3d at 858 (quoting Restatement (First) of Contracts § 291 cmt. a (1932)). Such an event "may be beyond the power of any human being to bring the event to pass; it may be within control of third persons, provided that the fact is unknown to the parties. The thrust of the definition is that the occurrence be unplanned and unintentional in nature." Peters Twp. Sch. Dist. v. Hartford Acc. and Indem. Co., 833 F.2d 32, 37 (3d Cir. 1987) (citing Compagnie des Bauxites de Guinee v. Ins. Co. of N. Am., 724 F.2d 369, 372 (3d Cir. 1983)); see also PECO Energy Co. v. Boden, Civ. A. No. 93-110, 1994 WL 418987 (E.D. Pa. Aug. 10, 1994) ("In essence, the doctrine precludes coverage from losses that are certain to occur."), judgment vacated, 64 F.3d 852; Law and Practice of Insurance Coverage Litig., § 35:3 ("Typically, the inherent fortuity doctrines preclude coverage based on what the insured knew or should have known about its potential liability at the inception date of the insurance policy at issue."). Whether a claimed loss is fortuitous is a question of law for the court to determine. Intermetal Mexicana, 866 F.2d at 74 (citing Compagnie des Bauxites, 724 F.2d at 371-372).

Thus, a fortuitous event is one "dependent on chance," i.e., one that is "unplanned and unintentional in nature" and the fortuity exclusion "precludes coverage from losses that are certain to occur."  The summary judgment record shows that, as early as 2003, the Frys knew that their stone veneer wall had structural deficiencies.  (Isett Report 1.) The Isett Report notes that "numerous repairs" had already been made to the exterior and that "some of the mortar joints have deteriorated as evidenced by loose and/or missing mortar."  (Id.)  Moreover, the Isett Report recommended that the wall be "dismantled in ten foot sections by a professional stone mason, checked for the structural integrity of the stud framing and sheathing behind, have repairs made if needed and reinstalled with the proper amount of wall ties and fasteners."  (Id. at 2.)  The summary judgment record shows that the Frys knew there was a "possibility of complete failure of the veneer and the stone falling down from its own weight" as early as 2003.  (See id. at 3.)  While there is no evidence that they knew the exact cause of the 2011 loss and the 2012 collapse — that the wall contained **no** masonry anchors — until after the collapse occurred, it is undisputed that they knew that there was a problem involving the wall anchors, to the point that there was little or no physical anchorage of the veneer wall to the wood frame. (See Gold Report at 1 ("there is not a good connection between the stone veneer and the framed wall").  They were told that there were "very few masonry anchors securing the stone to the framing behind," that the "bulging of the stone veneer was caused by inadequate anchorage to the wood framing," (see Daniels Report at App. 29), and that a collapse would occur if the wall was not braced until repairs could be implemented (see Gold Report at 1-2; Daniels Report at App. 30).  Nonetheless, they failed to follow the

recommendations of the experts to dismantle and rebuild the wall, and they failed to brace the wall until it could be repaired.  Accordingly, I conclude that no reasonable jury could determine on this record that the bulging and eventual collapse of the unrepaired and unbraced wall were fortuitous events because the undisputed record shows they were certain to occur.

Because Phoenix has demonstrated that the fortuity exclusion applies as a matter of law to exclude coverage, I conclude that it is entitled to summary judgment on the breach of contract claim for the failure to pay both the 2011 and 2012 losses.

### B.    The bad faith claim

In Count II of the Complaint, the Frys assert a bad faith claim under 42 Pa. Con. Stat. § 8371, which provides that "in action arising under an insurance policy, if the court finds that the insurer has acted in bath faith towards the insured, the court may . . . award interest on the amount of the claim . . . [a]ward punitive damages against the insurer . . . [a]assess court costs and attorney fees against the insurer."  42 Pa. Con. Stat. Ann. § 8371.  The statute does not, however, define the term "bad faith."

The Third Circuit, predicting the actions of the Pennsylvania Supreme Court, held that "bad faith on the part of the insurer is any frivolous or unfounded refusal to pay proceeds of a policy."  Northwestern Mut. Life Ins. Co. v. Babyan, 430 F. 3d 121, 137 (3d Cir. 2005) (citing Terletsky v. Prudential Prop. and Cas. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994)).  Where an insurance company undertakes a thorough investigation, it is not bad faith to subsequently deny a questionable claim.  Babyan, 430 F.3d at 138 (citing O'Donnell ex. rel Mitro v. Allstate Ins. Co., 734 A.2d 901, 907-908 (Pa. Super.

Ct. 1999)).  Thus, in order to prevail on this claim, an insured must prove (1) that the insurer had no reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim.  Babyan, 430 F.3d at 137 (citing Keefe v. Prudential Prop. and Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000)); Brown v. Progressive Ins. Co., 860 A.2d 493, 501 (Pa. Super. Ct. 2004) (holding that the insured "must show that the insurer breached its duty of good faith through some motive of self-interest or ill will") (citing Adamski v. Allstate Ins. Co., 738 A.2d 1033, 1036 (Pa. Super. Ct. 1999)).  "At the summary judgment stage, the insured's burden in opposing a summary judgment motion brought by the insurer is 'commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial."  Babyan, 430 F.3d at 137 (citing Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999)).

Because I find as a matter of law that Phoenix had reasonable bases for denying the 2011 and the 2012 claims, I also find that it is entitled to summary judgment on the Frys' claim under § 8371 as well.

## V.     CONCLUSION

For the reasons stated, the Motion of Defendant The Phoenix Insurance Company for summary judgment is granted.  An appropriate Order follows.